**KEARNY BARGE CO., INC., Plaintiff,**

**v.**

**GLOBAL INSURANCE COMPANY, Albany Insurance Company, American Home Assurance Company, American Motorists Insurance Company, Atlantic Mutual Insurance Company, Commercial Union Insurance Company, The Continental Insurance Company, Fireman's Fund Insurance Company, Generali–U.S. Branch, Great American Insurance Company, Hartford Fire Insurance Company, The Home Insurance Company, Insurance Company of North Amer-**

---

ica, New York Marine and General Insurance Company, Phoenix Insurance Company, Reliance Insurance Company, Royal Insurance Company of America, and St. Paul Fire and Marine Insurance Company, Defendants.

ALBANY INSURANCE COMPANY, American Home Assurance Company, American Motorists Insurance Company, Atlantic Mutual Insurance Company, Commercial Union Insurance Company, The Continental Insurance Company, Fireman's Fund Insurance Company, Generali–U.S. Branch, Great American Insurance Company, Hartford Fire Insurance Company, The Home Insurance Company, Insurance Company of North America, New York Marine and General Insurance Company, Phoenix Assurance of New York, Reliance Insurance Company, Royal Insurance Company of America, St. Paul Fire and Marine, as their interests may appear as subscribers to Water Quality Insurance Syndicate Number 7426–04, Third–Party Plaintiffs,

v.

KUEHNE CHEMICAL COMPANY, INC., Third–Party Defendant.

GLOBAL INSURANCE CO., S.A., Third–Party Plaintiff,

v.

KUEHNE CHEMICAL COMPANY, INC., Third–Party Defendant.

Civil Action No. 95–2103 (AJL).

United States District Court, D. New Jersey.

Sept. 13, 1996.

Gerald S. Doyle, Jr., The Law Offices of Gerald S. Doyle, Jr., Short Hills, NJ, for Plaintiff Kearny Barge Co.

Andrew J. Garger, Thacher Proffitt & Wood, New York City, John C. Lane, Newman, Schlau, Fitch & Lane, Newark, NJ, for Defendant and Third–Party Plaintiff Water Quality Insurance Syndicate.

Craig N. Greenawalt, Westfield, NJ, for Third–Party Defendant Kuehne Chemical Co., Inc.

## OPINION

LECHNER, District Judge.

Kearny Barge Company ("Kearny Barge") instituted this Admiralty action against Defendants Global Insurance Company ("Global"), and against Albany Insurance Company, American Home Assurance Company, American Motorists Insurance Company, Atlantic Mutual Insurance Company, Commercial Union Insurance Company, The Continental Insurance Company, Fireman's Fund Insurance Company, Generali—U.S. Branch, Great American Insurance Company, Hartford Fire Insurance Company, The Home Insurance Company, Insurance Company of North America, New York Marine Insurance Company, Phoenix Insurance Company, Reliance Insurance Company, Royal Insurance Company of America and St. Paul Fire and Marine Insurance Company, collectively as subscribers or members of the Water Quality Insurance Syndicate ("WQIS"). Kearny Barge seeks to "recover insurance payments for damages and expenses incurred in connection with the capsize and salvage of the barge CYNTHIA M" (the "Casualty"). Complaint, ¶ 1.

Kearny Barge specifically seeks a judgment against Global "for the payment of the Kuehne Chemical cargo damage claim in the amount of $163,328.00 plus interest." Complaint, Ad damnum clause, ¶ (a). In addition, Kearny Barge seeks judgments against Global, in the amount of $282,252.86, and WQIS, in the amount of $216,755.13, for payment of the liabilities arising from the Casualty apportioned to it by an adjustment prepared by Windward International, Inc. ("Windward"). Id., Ad damnum clause, ¶¶ (b)–(c). On 13 September 1995, Kearny Barge filed a motion to amend its complaint to include claims against Global and WQIS for attorney fees pursuant to Rule 4:42–9(a)(6) of the Rules Governing the Courts of the State of New Jersey ("Rule 4:42–9(a)(6)"). Subsequently, by an order filed 13 September 1995, the complaint was amended to include Kearny Barge's claims for attorney fees.

WQIS has filed a Third–Party Complaint against Kuehne Chemical Co., Inc. ("Kuehne Chemical") alleging the negligent acts of Kuehne Chemical and its employees were responsible for the Casualty. WQIS Third–Party Complaint, ¶ 10. WQIS "demands that [Kuehne Chemical] defend, save the (sic) hold WQIS harmless against Kearny[ ] [Barge's] claim." Id., Ad damnum clause. WQIS further seeks judgment against Kuehne Chemical for all sums which may be adjudged against WQIS in favor of Kearny Barge, together with all costs, expenses and attorneys fees and all sums expended by WQIS as a result of the Casualty. Id., ¶ (i), (iii).

Global filed an Answer on 7 June 1995 and an Amended Answer and Third–Party Complaint against Kuehne Chemical on 20 June 1995, alleging the negligent acts of Kuehne Chemical and its employees were responsible for the Casualty and seeking indemnification or, in the alternative, contribution. Global Amended Answer and Third–Party Complaint, ¶¶ 13–16. Global's counsel, however, filed a motion on 17 January 1996 requesting they be relieved as counsel for Global in the instant matter (the "Motion to be Relieved").[1] Counsel for Global informed the court Global had ceased paying its bills and had broken off communication. Hourican Aff., ¶¶ 4–6. Prior to making the Motion to be Relieved, Counsel for Global, pursuant to the court's instructions, informed Global that they would move to withdraw and that Global's failure to appear at trial may result in a judgment "against Global for [Kearny Barge's] claim of approximately $470,000.00 plus costs and attorneys' fees." Id., ¶ 7. The Motion to be Relieved was granted by an order, dated 31 January 1996; Global failed to appear at trial.

This matter was tried before the bench on 16 January, between 5–8 February and on 1 March 1996. Jurisdiction is based on 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure and is uncontested.[2]

---

1. In support of the Motion to be Relieved, counsel for Global submitted the Affirmation of Timothy G. Hourican (the "Hourican Aff."), dated 17 January 1996.

2. Following trial, the parties were given leave to file post-trial briefs. Kearny Barge submitted: Plaintiff's Written Summation (the "Kearny Barge Summation") and Plaintiff's Reply to "The

This opinion constitutes the court's Findings of Fact and Conclusions of Law. All proposed findings of fact and conclusions of law inconsistent with those set forth herein are rejected in accordance with Rule 52 of the Federal Rules of Civil Procedure.[3]

## I. *Findings of Fact* [4]

### A. *The Parties*

1. Kearny Barge is a corporation with its principal place of business in Kearny, New Jersey. Complaint, ¶ 2. Kearny Barge owns and operates "two barges, specifically outfitted to carry liquid chemicals." Goetzel C–1A, ¶ 4. At all times relevant to this action, Kearny Barge owned the Tanker Barge CYNTHIA M (the "CYNTHIA M"). Goetzel C–2A, ¶ 3.

2. At all relevant times, Kuehne Chemical was a New Jersey corporation with its principal place of business in Kearny, New Jersey; Kuehne Chemical operated a chemical production facility. Goetzel C–2A, ¶¶ 2, 7.

3. While not corporately-related, Kearny Barge and Kuehne Chemical are interrelated by virtue of their operations; the two companies, moreover, have the same shareholders and senior officers. Goetzel C–1A, ¶ 3; C–2A, ¶¶ 8–11. At all relevant times, Peter Kuehne ("Kuehne") was the president and Roger Goetzel ("Goetzel") was the vice president of Kearny Barge; they also "owned sufficient shares of Kearny Barge to determine its activities." Goetzel C–2A, ¶¶ 8–9. Kuehne and Goetzel were also the president and vice president of Kuehne Chemical and owned sufficient shares of Kuehne Chemical to determine its activities as well. *Id.,* ¶¶ 10–11.

4. At all relevant times, Global was a foreign marine insurance corporation. Second Amended Answer and Third–Party Complaint of Global Insurance, ¶ 2. Global issued Kearny Barge two policies of insurance for the operation of the CYNTHIA M, a "Hull and Machinery" policy and a "Protection and Indemnity" policy. Keller C–6, ¶ 34.

5. WQIS "is a pool of 17 major insurance companies comprising most of [the] American marine insurance market. It was formed under the laws of New York ... in 1971[.]" Document 35; Hobbie C–13, ¶ 3. WQIS insures pollution liabilities arising from an insured's legal liability in connection with the ownership or operation of scheduled vessels. Hobbie C–13, ¶ 3. WQIS issued an indemnification policy to Kearny Barge covering Kearny Barge's exposure to pollution liability in connection with its operation of the CYNTHIA M. Document 244.

### B. *Background*

6. The CYNTHIA M is a 802 gross-ton steel hull barge, 201.7 feet in length, 36.1

---

WQIS Defendants" Post–Trial Submission and Summation (the "Kearny Barge Reply"). WQIS submitted: Post–Trial Submission and Summation Water Quality Insurance Syndicate (the "WQIS Summation") and Reply of the Water Quality Insurance Syndicate to the Summations of Kearny Barge Company and Kuehne Chemical Company (the "WQIS Reply"). Kuehne Chemical submitted: Summation of Third–Party Defendant Kuehne Chemical Co., Inc. (the "Kuehne Chemical Summation") and Reply Summation of Third–Party Defendant Kuehne Chemical Co., Inc. (the "Kuehne Chemical Reply").

3. Rule 52 provides in pertinent part: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58...."
Fed.R.Civ.P. 52.

4. Prior to trial, the parties prepared written anticipated trial testimony (the "Anticipated Trial Testimony") for the witnesses they intended to call at trial. At trial, the Anticipated Trial Testimony was marked for identification and the witnesses swore to the statements contained therein. The Anticipated Trial Testimony was then entered into evidence and was considered the witness's direct testimony. References to the direct testimony of witnesses will be cited as: [witness], [Anticipated Trial Testimony exhibit number], ¶ _____. Counsel conducted cross-examination and re-direct examination of the witnesses. References to the witnesses' testimony on cross-examination and re-direct will be cited as: Tr. at [page number]. The parties also complied a joint document list of all documents that would be entered into evidence at trial (the "Joint Document List"). Documents will be referred to by their numbers on the Joint Document List.

feet in breadth and 13.9 feet in depth; it was built in Port Deposit, Maryland in 1959. Document 27. The CYNTHIA M has no engine and relies on tugboats for propulsion. Goetzel C–1A, ¶ 5.

7. Kearny Barge performs most of its work with the CYNTHIA M for Kuehne Chemical. Goetzel C–1A, ¶ 6; Cunha C–3, ¶ 12. Kearny Barge uses the CYNTHIA M to deliver raw materials, such as caustic soda, to Kuehne Chemical's facility in Kearny, New Jersey and to transport finished products to Kuehne Chemical's customers. Goetzel C–1A, ¶ 7; Cunha C–3, ¶ 13.

8. When Kearny Barge delivers raw materials, it attaches a hose, which is a permanent element of the CYNTHIA M's equipment, to Kuehne Chemical's on-shore intake manifold and, using the barge's pump, pumps the cargo through the manifold into Kuehne Chemical's pipe system. Goetzel C–1A, ¶ 8; Cunha C–3, ¶ 14.

9. When Kuehne Chemical delivers finished product to Kearny Barge, the process reverses, and Kuehne Chemical uses its pump to send chemicals through a discharge manifold, and the barge's hose, into the barge's hold. Goetzel C–1A, ¶ 9; Cunha C–3, ¶ 15.

10. By agreement between Kearny Barge and Kuehne Chemical, Kearny Barge is responsible both for its barges and for Kuehne Chemical's cargo until the barges deliver raw material to Kuehne Chemical's intake manifold and once Kuehne Chemical's product leaves the discharge manifold. Goetzel C–1A, ¶¶ 7–10, C–2A, ¶ 12; Cunha C–3, ¶¶ 14–16. Each company insured its risks on that basis. Goetzel C–1A, ¶ 11, C–2A, ¶ 13.

11. At the time of the Casualty, Kearny Barge had one salaried employee, a tankerman, or barge operator, named John Woods ("Woods"). Goetzel C–1A, ¶ 12, C–2A, ¶ 14–17; Cunha C–3, ¶ 17. Woods is licensed as a tankerman by the Coast Guard. Cunha C–3, ¶ 18. Woods performed the tasks necessary to load and unload Kearny Barge's barges, in-cluding the CYNTHIA M, and tended to the barges during voyages. Goetzel C–1A, ¶ 13, C–2A, ¶¶ 18–20; Cunha C–3, ¶ 19.

12. In November 1993, Kearny Barge and Kuehne Chemical determined an additional employee was needed to assist Woods with his job responsibilities. Goetzel 2–A, ¶ 25. Kuehne Chemical provided Kearny Barge with Arthur Henry ("Henry"), a Kuehne Chemical employee, to assist Woods, and to replace him on occasions when he was ill or otherwise unavailable. Goetzel C–1A, ¶ 14, C–2A, ¶¶ 25–26; Cunha C–3, ¶ 20. Henry was assigned to work on the CYNTHIA M by Manuel Cunha, Kuehne Chemical's plant superintendent. Henry C–5, ¶ 7; see Cunha C–3, ¶¶ 20, 21.

13. Henry was paid by Kuehne Chemical for the work he performed for Kearny Barge, however, Kearny Barge reimbursed Kuehne Chemical for Henry's services. Goetzel C–1A, ¶ 17, C–2A, ¶¶ 34, 35.

14. Henry received training from Woods in his responsibilities in loading and unloading barges for Kearny Barge. Woods C–12, ¶¶ 15–17; Henry C–5, ¶¶ 11–16. Henry's training was primarily on the job training but included studying "written material"; Henry also passed "written examinations" and received a "certification" to operate the CYNTHIA M. Henry C–5.1, ¶¶ 24–25. The training Henry received from Woods qualified him to operate the CYNTHIA M without supervision. Id., ¶ 26; Woods C–12.1, ¶ 36.

## C. *The Casualty*

15. On the night of 14 March 1994 or in the early morning of 15 March 1994, Henry prepared the CYNTHIA M to be towed from Kuehne Chemical's dock in South Kearny to an anchorage at Stapleton, Staten Island, New York. Henry C–5, ¶ 20, C–5.1, ¶ 34.

16. Henry remained on board and tended to the CYNTHIA M while it was towed to the anchorage. Henry C–5, ¶ 26.

17. At the anchorage, Henry made the CYNTHIA M ready to receive a cargo of caustic soda solution [5] from the M/V STOLT SPRAY. Henry C–5, ¶ 27.

18. The CYNTHIA M was loaded with a cargo of caustic soda under the Henry's supervision. Henry C–5, ¶ 28, C–5.1, ¶ 35. Approximately 310,000 gallons of caustic soda were loaded in CYNTHIA M's interior tanks. Document 5 at 2.

19. After the loading operation was completed, Henry secured the CYNTHIA M and made it ready to be towed back to Kuehne Chemical's dock. Henry C–5, ¶ 29. Henry, however, was unable to close two of the CYNTHIA M's cargo valves for the tow back to the dock. *Id.,* ¶¶ 21–23. These valves had become similarly "frozen" in the past. *Id.,* ¶ 22. The open valves, however, did not pose a danger because the cargo could not travel from one compartment to another with only these valves open; two additional sets of valves would have to be opened for this to occur. *Id.,* ¶ 25. Henry, moreover, was aware of methods of "unfreezing the valves" if it became necessary. *Id.,* ¶ 23. The tow back to the Kuehne Chemical dock was uneventful. *Id.,* ¶ 31.

20. The CYNTHIA M arrived back at the Kuehne Chemical dock at approximately 3:30 a.m. on 15 March 1994; after arrival, Henry, aided by members of the Tugboat's crew secured the CYNTHIA M to the Kuehne Chemical dock. Henry C–5.1, ¶ 36. Henry then opened all of the cargo transfer valves, commonly referred to as butterfly valves (the "Butterfly Valves"), and unsecured the CYNTHIA M's hatch covers to prepare for unloading the barge. Henry C–5, ¶¶ 36–39. When closed, the Butterfly Valves compartmentalize the CYNTHIA M's internal tanks. *Id.,* ¶ 38; Cunha C–3, ¶ 27. Henry's opening of the Butterfly Valves permitted the cargo of caustic soda to flow freely from one side of the barge to the other. Henry C–5.1, ¶ 39; Woods C–12.1, ¶ 39. This flow of the cargo may cause the barge to become unstable and, therefore, the Butterfly Valves should have remained closed until the time the cargo was to be off-loaded. Woods C–12.1, ¶ 41.

21. It is unclear whether Henry was specifically instructed not to open the Butterfly Valves prior to discharging; Henry testified he was not so instructed, Henry C–5, ¶ 40; Woods testified, however, he had advised Henry not to open the valves in this manner, Woods C–12, ¶ 16. There were no Coast Guard rules or regulations prohibiting the opening of the Butterfly Valves prior to discharging. Document 2, unnumbered p. 9. No one instructed Henry, however, to open the Butterfly Valves in this manner; he apparently did so on his own initiative. *See* Henry C–5, ¶ 34. It appears, moreover, Henry was aware that opening the Butterfly Valves in this manner allowed the caustic soda to "move from one compartment to another." *Id.,* ¶ 25.

22. For safety reasons, Kearny Barge unloads its barges only during daylight hours, Goetzel, C–2A ¶ 36, therefore, at 3:30 a.m., after securing the CYNTHIA M to the Kuehne Chemical dock and opening the Butterfly Valves and hatch covers, Henry left the barge and waited for Woods' arrival. Henry C–5 ¶ 34. Kearny Barge intended to begin unloading the CYNTHIA M at approximately 6:00 a.m. Henry, C–5.1, ¶¶ 40–41.

23. Between 3:30 a.m. and 6:00 a.m., while tied to the Kuehne Chemical dock, the CYNTHIA M developed a seventy degree list to port. Document 9. The CYNTHIA M did not sink because the water at the dock was too shallow; her port side, however, came to rest "solidly on [the] bottom." Document 10. According to Coast Guard estimates, approximately 106,000 gallons of caustic soda were released as a result of the Casualty. Document 22.

---

**5.** Caustic soda is the chemical sodium hydroxide. The American Heritage Dictionary 250 (2d ed.1991).

24. The cause of the Casualty was that the Butterfly Valves were open, which allowed the cargo to shift creating an imbalance and resulting in a progressively worsening list until the barge sank, coming to rest on her port side. Document 2 at unnumbered p. 1.

25. Upon discovering the CYNTHIA M had capsized, Woods notified the U.S. Coast Guard. Woods C–12, ¶ 21.

26. On 15 March 1994, a Coast Guard diving team conducted an underwater survey of the exposed bottom plating of the CYNTHIA M and reported that there was no visible damage to the hull. Document 5 at 2. The Coast Guard's testing of the water surrounding the CYNTHIA M, however, confirmed that caustic soda was leaking from the vessel. *Id.* The Coast Guard's tests were confirmed by the New Jersey Department of Environmental Protection. *Id.*

27. Kearny Barge quickly contracted with Randive, Inc. ("Randive"), a professional diving company, "to assist with the closure of all tank openings and cargo valves." Document 5 at 2. On 16 March 1996, Randive's divers succeeded in closing all tank openings and cargo valves, stopping the leaking of caustic soda from the CYNTHIA M. *Id.* at 2–3. From 16 March 1994 until completion of the salvage of the CYNTHIA M on 1 April 1994, there was no further release of caustic soda from the barge except for a minor escape during the refloating operation, too small to require any cleanup. Stoll C–14, ¶¶ 5, 27, 29.

28. WQIS arranged for its cleanup contractor, S & D Environmental Services, Inc. ("S & D Environmental"), to respond to the Casualty and to address the pollution threat. Stoll C–14, ¶ 6. After arrival on the scene of the Casualty, however, S & D Environmental maintained a standby response because, after Randive's closing of the tank valves and cargo openings, the CYNTHIA M "was secure in its submerged condition, and no pollution was occurring." *Id.*, ¶ 7. S & D Environmental remained on the scene of the Casualty until it was re-leased by the Coast Guard on 19 March 1994. *Id.*, ¶¶ 6, 9. As directed by the Coast Guard, WQIS also had S & D Environmental return on 1 April 1994, the day of refloating, to be prepared to address any further pollution incident during the refloating of the vessel. *Id.*, ¶ 26.

29. Kuehne Chemical employees, acting on behalf of Kearny Barge, contacted two salvage companies—Weeks Jamestown Marine Co., Inc. ("Weeks") and Donjon Marine Co., Inc. ("Donjon"). Cunha C–3, ¶¶ 41–42; Swift C–9, ¶ 18. On the advice of John Swift ("Swift"), a marine surveyor, acting on the behalf of the "Hull and Machinery" underwriters, both Weeks and Donjon were asked to submit salvage proposals on a "lump sum, no cure, no pay" basis for the raising of the CYNTHIA M. Documents 224, 225, 226 and 228; Swift C–9, ¶ 20; Cunha C–3, ¶ 42.

30. On 17 March 1994, Weeks and Donjon submitted salvage proposals on a "lump sum, no cure, no pay" basis. Documents 40, 41. Donjon offered to raise the CYNTHIA M for $279,000.00. Document 41. Weeks offered to raise the CYNTHIA M for $114,600.00. Document 40. Both proposals, however, were rejected because of various technical questions. Document 5 at 3.

31. On 18 March 1994, Weeks and Donjon submitted revised proposals. Document 5 at 3. Weeks now proposed to raise the CYNTHIA B for $160,400.00. (the "Weeks Proposal") while Donjon proposed to raise the CYNTHIA M for $239,500.00 (the "Donjon Proposal"). *Id.*

32. The Weeks Proposal called for the pumping of the caustic soda, either internally from port to starboard tanks, or off the CYNTHIA M. Documents 40, 42. Kearny Barge, although preferring the less expensive Weeks Proposal, recognized its technical problems, including concerns about the amount of time it would take to pump the caustic soda from the port side to the starboard side and the fact that the caustic soda may

have been frozen, as the properties of caustic soda are such that the mixture present in the CYNTHIA M's port tanks had a freezing point of approximately 50 degrees Fahrenheit. Document 34. Kearny Barge recognized the Weeks Proposal would not work if the caustic soda was frozen. *Id.;* Tr. at 66.

33. The Coast Guard refused to approve the Weeks Proposal because it was not satisfied with, among other things, the lifting capacity of Weeks' crane. Documents 202, 227, 261; Cunha C–3, ¶ 35. The Coast Guard was also not satisfied with Weeks' stability calculations, its proposed method of removal of the cargo, storage of the cargo and timetable. Document 202; Cunha C–3, ¶ 35.

34. On 21 March 1994, Captain T.H. Gilmour, the U.S. Coast Guard Captain of the Port of New York issued a "Captain of the Port Order" informing Kearny Barge that the Coast Guard was not satisfied with Kearny Barge's efforts to develop and implement a salvage plan. Document 227 (the "Captain of the Port Order"). *Id.* Kearny Barge was directed to submit a suitable salvage plan by 6:00 p.m. on 22 March 1994. *Id.* The Captain of the Port Order further provided the Coast Guard would "initiate steps to federalize the response to prevent further discharge of caustic soda solution into the Hackensack River and eliminate a substantial threat to the environment." *Id.*

35. The Weeks Proposal was abandoned and Kearny Barge chose Donjon as its salvor. Document 34; Swift C–9, ¶ 30; Cunha C–3, ¶¶ 44–45. The Coast Guard ultimately approved the revised Donjon Proposal. Document 14; Swift C–9, ¶ 33.

36. There was a delay, however, in the execution of the salvage contract between Kearny Barge and Donjon. Cunha C–3 ¶ 46; Stoll C–14, ¶ 21. On 25 March, because of the delay, the Coast Guard "federalized" the salvage operation. Documents 15, 231; Swift C–9, ¶ 35; Cunha C–3, ¶ 47. The Coast Guard believed that federalization was

"necessary to eliminate the threat of release posed by the remaining cargo on board." Document 16. At the same time, the Coast Guard raised its budget for the operation to $400,000.00 "due to switch from monitoring activities to conducting removal actions on scene." *Id.*

37. The Coast Guard contacted the United States Navy's Supervisor of Salvage ("SUPSALV") to conduct the salvage operation. Document 16. SUPSALV then prepared to hire Donjon as its salvor under the "federalized" salvage operation. *Id.*

38. Kearny Barge, however, was able to conclude its negotiations with Donjon, Document 17; Swift C–9, ¶ 36, and on 30 March 1994, the Captain of the Port returned the salvage operation to Kearny Barge's control. Document 26; Cunha C–3, ¶ 52. The Coast Guard directed Kearny Barge to conduct the salvage of the CYNTHIA M in a safe and expeditious manner. Document 26.

## D. *The Salvage Operation*

39. On 1 April 1994, in a one day operation, Donjon righted and refloated the CYNTHIA M with the use of two cranes. Documents 19, 20. Although a minor amount of caustic soda was released during the salvage operation, no pollution cleanup was required. Stoll, C–14, ¶ 27. At 6:45 p.m., the Coast Guard released S & D Environmental. *Id.,* ¶ 28.

40. Following the successful salvage of the CYNTHIA M, the caustic soda, which had become contaminated, was pumped from the barge into one of Kuehne Chemical's storage tanks. Cunha C–3, ¶ 57. Because a portion of the caustic soda remaining on board the CYNTHIA M had frozen, Kuehne Chemical was required to heat the cargo prior to pumping it off the CYNTHIA M. Documents 2; 21. In fact, an estimated 28,000 gallons of caustic soda solution were frozen and it was not until 6 April 1994 that the heating of the cargo, using the "internal steam coils," returned the last of the caustic soda to a

"pumpable liquid state." Document 21. Kuehne Chemical subsequently treated the contaminated caustic soda by mixing it with uncontaminated caustic soda. Cunha C–3, ¶ 61.

41. Kuehne Chemical incurred damages of $241,147.69 as a result of the lost and contaminated cargo of caustic soda; it was able, however, to offset a portion of these losses and its net losses as a result of the Casualty were $163,328.00. Cunha C–3, ¶¶ 65–67. Kuehne Chemical filed a claim against Kearny Barge for the value of these losses. *Id.*, ¶¶ 68–69. Kearny Barge passed the claim to Global, as its P & I insurer, but Global apparently has refused to pay the claim. Kearny Barge Summation at 22, ¶ 137.

### E. *The Salvage Costs*

42. Kearny Barge appointed Windward to be its Average Adjuster for the Casualty. Keller C–6, ¶ 16. Average Adjusters apportion losses, damages and expenses among various parties, including the vessel owner, the cargo owner and the insurance companies insuring the "various vessel and cargo risks." *Id.*, ¶ 9. Average Adjusters rely on marine surveyors "to determine if services that have been billed have actually been performed and whether those bills are fair and reasonable." *Id.*, ¶ 26.

43. Windward hired Marine Consultants, Inc. ("Marine Consultants"), from a pre-approved list of marine surveyors, to be the marine surveyors for Global. Document 110; Swift C–9, ¶¶ 6, 7; Keller C–6, ¶¶ 36–38.

44. Marine Consultants retained Swift to assist in its marine survey work. Keller C–6, ¶ 42. At the time of the Casualty, Swift had very little marine salvage experience. Tr. at 120. Before the Casualty, he had neither worked in salvage nor received training in salvage. *Id.* at 147. Swift's work on the Casualty was the first time he had ever served as a marine surveyor on a casualty involving the capsizing of a barge upon a navigable river. *Id.* at 148.

45. As indicated, Donjon was awarded the salvage contract and was paid $239,-400.00 by Kearny Barge. Keller C–6, ¶ 53. After Kearny Barge submitted its expenses to Windward, David Keller, Windward's Vice President ("Keller"), contacted Swift and asked him to "estimate the cost of rasing the [CYNTHIA M] if there had been no 'hazardous material' on board." *Id.*, ¶ 58–59.

46. On 25 April 1994, Swift completed Survey Report No. 94047 (the "Swift Survey") which concluded, in his opinion, "if there had not been a cargo on board which was considered hazardous, i.e. ballast water, or no cargo at all, the cost of the salvage operation would have been approximately $70,000.00." Document 5 at 6–7. The Swift Survey consists of a summary of the events of the salvage operation. *Id.* at 1–6. Aside from Swifts' conclusory statement that the "salvage efforts and costs associated with them were greatly influenced by the restrictions placed upon the salvors as a result of the environmental requirements imposed upon the operation by the governmental authorities due to the nature of the cargo," the Swift Survey provides no basis for the proposition that government pressure because of the pollution threat influenced the salvage costs. *Id.* Swift testified that he had never prepared an estimate like the Swift Survey and that he consulted Johan van Grieken, the principal of Marine Consultants, for assistance in preparing the estimate. Tr. at 162–63.

47. Swift failed to ascertain accurate *per diem* charges on the salvage equipment prior to making his cost estimate and the Swift Survey, therefore, understates the cost of the equipment and labor used in salvage operations. Tr. at 157–59. While Swift testified that "lump sum, no cure, no pay" salvage contracts are common in the marine industry and are preferred by owners and hull underwriters in most circumstances, he prepared the Swift Survey based on a time and materials basis and assumed that no complication would occur during the hypothetical salvage operation. Swift

C–9, ¶¶ 23, 38–47. The Swift Survey should have assumed a salvage contract on a "lump sum, no cure, no pay basis." Tr. at 163. A "lump sum, no cure, no pay" salvage contract would have been more expensive because the salvor would have to assume all known and unknown risks and would not be paid if the salvage is not successful. Swift C–9, ¶ 21.

48. Having had the benefit of Swift's trial testimony and having reviewed the evidence, it is clear that Swift was not a credible witness. As indicated, his background does not appear to qualify him to estimate the costs of a hypothetical salvage operation. His "estimate," moreover, is based upon an unrealistic set of circumstances and was improperly calculated. The Swift estimate was no more than an uneducated guess at the costs of a hypothetical salvage operation.

49. Henk van Hemmen ("van Hemmen") testified as an expert at trial for Kearny Barge; he has been engaged in marine operations since 1951. van Hemmen C–8, ¶ 1. He is an experienced engineering and marine consultant. Document 60. van Hemmen rendered an opinion that the Swift Survey estimate of $70,000.00 to raise the CYNTHIA M in the absence of the pollution risk was "realistic, fair and reasonable based on the question posed, plus or minus $5,000." van Hemmen, C–8, ¶ 16. In rendering his opinion, van Hemmen assumed: (1) no Coast Guard interference; (2) the salvage operations could be carried out in a relaxed fashion; (3) the salvage operations could accommodate the salvor's schedule; and (4) a continuous 24–hour operation would not be required. Id., ¶ 17.

50. Having had the benefit of van Hemmen's trial testimony, it is clear he was not a credible witness and his estimate is also flawed. Like Swift, van Hemmen assumed unrealistic conditions for the hypothetical salvage. He speculated the salvors could pump off the barges' ballast or off-load the cargo. Tr. at 283. van Hemmen's plan, however, would likely have created stability problems which may have caused the CYNTHIA M to fully capsize, posing danger to the salvors and presenting a hazard to navigation. Sambrook C–15A. At trial van Hemmen admitted this was a possible result of his plan. Tr. at 287. van Hemmen's plan, moreover, would likely not have worked. As indicated, the physical properties of caustic soda are such that it freezes at 50 degrees Fahrenheit. van Hemmen's plan did not account for this non-pollution related property of the cargo on board the CYNTHIA M. Tr. at 285 (assuming a barge filled with water in evaluating salvage costs). Finally, despite contending time pressure caused by the pollution threat drove up the salvage costs, in his report, van Hemmen recognized the Coast Guard demonstrated patience and were considerate regarding the Owners' interest in attempting to "get the best deal for the best price." Document 57 at 8.

51. WQIS' expert, marine surveyor Rodney Sambrook ("Sambrook") testified that while the Donjon salvage price of $239,500.00 was somewhat affected by the nature of the cargo, the Coast Guard would have pressured Kearny Barge to address the Casualty regardless of the pollution threat. Document 296. Sambrook opined that even absent the pollution threat, the bids on the salvage would have been substantially the same. Id. Sambrook evaluated Swift's calculations of the salvage costs and concluded, that with accurate prices for the equipment necessary to raise the CYNTHIA M, the price would have been at least $170,000.00 on a time and materials basis. Id.

52. Having the benefit of Sambrook's trial testimony, Sambrook was a credible witness and his estimate of the hypothetical salvage costs at a time and materials basis is accurate. It appears, however, that this estimate understates what the actual costs of the hypothetical salvage operation would have been because it was calculated on a time and materials basis not a "lump sum, no cure, no pay" basis which is more common in the industry. As indicated a

"lump sum, no cure, no pay" salvage contract would have been more expensive because the salvor would have to assume all known and unknown risks and would not be paid if the salvage was not successful. Swift C–9, ¶ 21.

53. The "threat" of pollution, did not affect the price of the salvage contracts in a meaningful way. By the time the first salvage proposals were received on March 17th, Documents 40, 41, all leakage of caustic soda had been stopped for more than a day. Document 5 at 3; Tr. at 169–170. This minimized the need for hasty action. Document 5 at 3; Tr. at 170. On the following day, 18 March, Weeks and Donjon submitted their revised proposals. Documents 38, 40, 42. As indicated, the Donjon Salvage Proposal's price dropped by $40,000.00 to $239,500.00. The fact that a portion of the cargo was frozen, however, does appear to have affected the price of the salvage by limiting the salvor's options. Tr. at 216. This physical property of the cargo was not related to the pollution threatened by the Casualty and was not accounted for by either Swift or van Hemmen.

### F. *The Insurance Policies*

54. As indicated, Windward was an insurance broker for Kearny Barge and obtained "Hull and Machinery" (the "Hull and Machinery Policy") and "Protection and Indemnity" insurance (the "P & I Policy") (collectively, the "Global Policies") from Global for Kearny Barge's operation of the CYNTHIA M. Keller C–6, ¶ 34. Windward also obtained insurance for Kearny Barge from WQIS to insure against pollution liabilities in connection Kearny Barge's operation of the CYNTHIA M (the WQIS Policy"). *Id.*, ¶ 35.

### 1. *The Global Policies*

### a. *Global's P & I Policy*

55. Kearny Barge's P & I Policy insured against: "Liability for loss of, or damage to, or in connection with cargo ... carried, or which has been carried on board

the vessel named herein ..." Document 33, Clause 8; *see* Document 110.

### b. *Global's Hull and Machinery Policy*

56. Kearny Barge's Hull and Machinery Policy contained an "Inchmaree" clause which provided:

Subject to the conditions of this Policy, this insurance ... covers loss of or damage to the Vessel directly caused by the following:

Accidents in loading, discharging or handling cargo, or in bunkering.... Negligence of Masters, Officers, Crew or Pilots; providing such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. Documents 32, (the "Inchmaree Clause"); Document 110.

### 2. *The WQIS POLICY*

57. The WQIS policy provides:

"[T]he Subscribers to [WQIS] do hereby agree to:

(1) indemnify the Assured for such amounts as the Assured shall have become liable to pay and shall have paid as owner or operator of the [CYNTHIA M] ...

and

(2) reimburse the Assured for such certain other costs and expenses, as described below which the Assured shall have incurred as owner or operator of the [CYNTHIA M], by reason or with respect to:

\*     \*     \*     \*     \*     \*

Section C

Liability imposed under Section 107(a)(1) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Public Law 96–510), hereafter "CERCLA", and costs and expenses incurred by the Assured for removal, response or remedial action (as "removal, "response" and "remedial action" are defined under Section 101 of CERCLA) for which liability would have been imposed under Section 107(a)(1) of

CERCLA had the Assured not undertaken such removal, response or remedial action voluntarily. Liabilities imposed under any other Section or Subsection of CERCLA are specifically excluded.

Section D

"Any liabilities ... arising from the sudden and unintentional discharge, spillage, leakage or emission of ... chemicals ... and costs and expenses incurred by the Assured for actions taken with the approval of WQIS to avoid or mitigate the liabilities insured against under this SECTION D."

Document 244 (WQIS Policy, Part I).

58. The WQIS Policy excludes from coverage any "cost or expense incurred by [Kearny Barge] without the prior consent of WQIS." Document 244 (WQIS Policy, Part III). This exclusion, however, does not apply to costs or expenses related to "removal, response or remedial action ... for which liability would have been imposed under ... CERCLA had the assured not undertaken such removal, response or remedial action voluntarily." *Id.*

59. The WQIS Policy preserves to WQIS all rights of subrogation which the assured may have against any other person or entity. Document 244 (Part III, Section G).

60. The WQIS Policy does not provide Windward with authority to act on its behalf. Hobbie C–13, ¶ 23.

G. *The Adjustment of the salvage expenses: Apportionment between Global and WQIS*

61. Kearny Barge sent all of the bills and survey reports to Windward, the Average Adjuster named in the Global Policies. Keller C–6, ¶¶ 54–55; Documents 5 and 285.

62. Windward prepared an adjustment (the "Adjustment") of the costs and expenses resulting from the Casualty. Document 1. The Adjustment was prepared by Keller, Keller C–6, ¶ 75; McGarry C–7, ¶ 6, and signed by Stephen McGarry, the President and an Average Adjuster at Windward. Docu-

ment 1; Keller C–6, ¶ 76; McGarry C–7, 22. The Adjustment is a proposed allocation of the costs and expenses resulting from the Casualty and includes costs relating to the salvage operation. Document 1.

63. The Adjustment apportioned the $239,500.00 Donjon salvage bill between the Hull and Machinery Policy and the WQIS Policy, as follows: Hull insurance: $70,000.00, WQIS insurance: 169,500.00. Adjustment, Document 1; *see,* Keller C–6, ¶¶ 58–64, 66, 67.

64. Allocating a portion of a salvage bill to a pollution policy like the WQIS Policy is unusual. At trial, Keller testified that it was something he had never before done. Tr. at 118. Swift testified that he had never before been asked to provide an allocation of salvage expenses or costs to a pollution underwriter. Tr. at 146. Richard Hobbie, III ("Hobbie"), the President of WQIS, testified that "the cost of raising or salvaging a sunken barge or vessel has never been indemnified by a WQIS policy. Such costs have always been covered by the vessel's hull or P & I insurance." Hobbie C–13, ¶ 5. Hobbie, moreover, testified that a review of "over 1000 claims ... currently maintained in the offices of WQIS" revealed two adjustments, "neither of which resulted in a contribution towards salvage expenses by WQIS." Hobbie C–13A, ¶ 1.

65. In addition to the Donjon salvage expenses of $239,500, the Adjustment reported Kearny Barge had incurred the following bills in connection the Casualty:

| | |
|---|---:|
| CR Harbor towing | $ 1,800.00 |
| CR Harbor towing | 2,322.00 |
| CR Harbor Towing | 1,080.00 |
| S & D Environmental Services, Inc. | 28,231.66 |
| S & D Environmental Services, Inc. | 2,371.13 |
| NJDEPE, Bureau of Revenue | 3,318.31 |
| Lowenstein, Sandler, Kohl, Fisher & Boylan | 3,386.20 |
| Randive, Inc. | 2,365.00 |
| Randive, Inc. | 3,245.00 |
| Randive, Inc. | 575.00 |
| Weeks Marine, Inc. | 25,077.32 |
| Weeks Jamestown Inc. | 12,709.18 |
| Marine Consultants, Inc. | 4,692.25 |
| Craig N. Greenawalt | 1,927.50 |
| CR Harbor Towing | 450.00 |

| | |
|---|---|
| First Marine Shipyard, Inc. | 184,500.00 |
| Meyerrose, Inc. | 1,225.00 |
| Marine Consultants, Inc. | 3,788.39 |
| Mendes & Mount | 2,224.64 |
| Lindabury, McCormick & Estabrook | 18,754.50 |
| Windward International, Inc. | 635.75 |
| Windward International, Inc. | 25,750.00 |
| | |
| Total expenses (including the Donjon bill of $239,500.00): | $ 569,928.74 |

Document 1; Keller C–6, ¶ 56.

66. The Adjustment allocated the following expenses to the WQIS Policy:

| Bill | Total | Allocation |
|---|---|---|
| S & D Environmental | 28,231.66 | 28,231.66 |
| S & D Environmental | 2,371.13 | 654.40 |
| NJDEPE | 3,318.31 | 3,318.31 |
| Randive, Inc. | 2,365.00 | 765.00 |
| Randive, Inc. | 3,245.00 | 1,045.00 |
| Randive, Inc. | 575.00 | 575.00 |
| Weeks Marine, Inc. | 25,077.23 | 3,288.61 |
| Donjon Marine Co., Inc. | 239,500.00 | 169,500.00 |
| First Marine Shipyard, Inc. | 184,500.00 | 900.00 |
| Windward International, Inc. | 635.75 | 127.15 |
| Windward International, Inc. | 25,750.00 | 8,350.00 |
| | | |
| Total | | $216,755.13 |

Document 1; Keller C–6, ¶ 66.

67. The Adjustment allocated the following expenses to Kearny Barge:

| Bill | Total | Allocation |
|---|---|---|
| CR Harbor Towing | 1,800.00 | 1,800.00 |
| CR Harbor Towing | 2,322.00 | 2,322.00 |
| CR Harbor Towing | 1,080.00 | 1,080.00 |
| S & D Environmental | 2,371.13 | 1,716.13 |
| Lowenstein, Sandler | 3,386.20 | 3,386.20 |
| Weeks Jamestown | 12,709.18 | 12,709.18 |
| Craig N. Greenawalt | 1,927.50 | 1,927.50 |
| Mendes & Mount | 2,224.64 | 2,224.64 |
| Lindabury, McCormick | 18,754.50 | 18,754.50 |
| | | |
| Total | | $ 45,920.75 |

Document 1; Keller C–6, ¶ 68.

68. The balance of the expenses was assigned to the account of Global as the Hull and Machinery insurer: $307,252.86. *See* Document 1; Keller C–6, ¶ 6:

| Bill | Total | Allocation |
|---|---|---|
| Randive, Inc. | $2,365.00 | $1,600.00 |
| Randive, Inc. | 3,245.00 | 2,200.00 |
| Weeks Marine, Inc. | 25,077.23 | 21,788.62 |
| Marine Consultants, Inc. | 4,692.25 | 4,692.25 |
| Donjon Marine Co., Inc. | 239,500.00 | 70,000.00 |
| CR Harbor Towing | 450.00 | 450.00 |
| First Marine Shipyard, Inc. | 184,500.00 | 183,600.00 |
| Meyerrose and Co., Inc. | 1,225.00 | 1,225.00 |
| Marine Consultants, Inc. | 3,788.39 | 3,788.39 |
| Windward Int'l, Inc. | 635.75 | 508.60 |
| Windward Int'l, Inc. | 25,750.00 | 17,400.00 |
| | | |
| Total | | $307,252.86 |

Document 1; Keller C–6, ¶ 56.

69. As of the time of trial, Kearny Barge had paid the Donjon $239,500.00 salvage bill, the $184,500.00 First Marine Shipyard Inc. repair bill, the $1,225.00 Meyerrose and Co., Inc. survey bill, and various attorneys' fees (Lowenstein, Sandler, Kohl, Fisher & Boylon $3,386.20, Greenawalt $1,927.50, Mendes & Mount $2,224.64, and Lindabury McCormick & Easterbrook $18,754.50). Goetzel C–1A, ¶ 26.

70. After receiving a copy of a letter from S & D Environmental to Kearny Barge stating that S & D Environmental had not been paid for its services, WQIS paid S & D Environmental's bill of $28,886.06. Hobbie C–13, ¶ 18. WQIS also paid other bills associated with the Casualty, but not reflected on the Windward Survey, amounting to $20,821.41. *Id.,* ¶ 19.

71. At the time of trial, Kearny Barge had not paid many of the amounts allocated in the Windward Adjustment to WQIS; specifically, Kearny Barge had not paid the bills of the following companies: NJDEPE, First Marine Shipyard, Randive and Weeks. Hobbie C–13, ¶ 12.

II. *Discussion*

This opinion addresses six issues. The first is whether the salvage costs resulting from the Casualty are covered by the Global Hull and Machinery Policy. The second is whether Kuehne Chemical's cargo claim against Kearny is covered by the Global P & I Policy. The third is whether Donjon's salvage of the CYNTHIA M can be attributed to pollution control and, therefore, properly charged to the WQIS Policy. The fourth is whether WQIS is liable to pay certain costs, other than Donjon's salvage bill, allocated to it by the Adjustment. The fifth is whether WQIS is entitled to judgment against Kuehne Chemical for all amounts it pays out under the WQIS Policy. The sixth and final issue is whether Kearny Barge is entitled to attorney fees from either WQIS or Global.

## A. The Global Hull and Machinery Policy

■ Almost every hull policy today contains an "Inchmaree Clause." *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1437 (5th Cir.1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (1993). The purpose of an Inchmaree Clause is to broaden the coverage under a marine insurance policy. *Id.* (citing *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir.1979)). The Global Hull and Machinery Policy's Inchmaree Clause provides coverage for "loss or damage to the Vessel directly caused by the ... [n]egligence of the Masters, Officers, Crew or Pilots; provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them." Document 32 (Inchmaree Clause). To determine whether the Casualty was covered by the Global Hull and Machinery Policy, therefore, necessitates determining whether Henry was a "crewmember" of the CYNTHIA M, and whether the Casualty was caused by Henry's negligence, not from want of due diligence on the part of Kearny Barge.

### 1. Henry as a Crewmember

To determine whether Henry may properly be considered a "crewmember" for the purposes of the Inchmaree Clause requires an inquiry into what his function was with respect to the operation of the CYNTHIA M. *Continental Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d 533, 535 n. 1 (2d Cir.1977) (the insured's "superintendent" deemed "master" of a barge because he supervised its operation).

The Supreme Court recently addressed a similar issue of who may properly be considered a seaman for the purposes of the Jones Act, 46 U.S.C.App. § 688. The Court concluded: "The inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relationship to it." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). In *McDermott*, the Supreme Court established that a person is a seaman under the Jones Act

when he or she performs the work of the vessel. *Id.* at 355, 111 S.Ct. at 817 (holding that it is not necessary that a seaman aid in navigation or transportation of the vessel).

It appears, therefore, appropriate to consider Henry's function to determine if he was a "crewmember" of the CYNTHIA M for the purposes of the Inchmaree Clause. As indicated, Henry prepared the CYNTHIA M for her voyage to Staten Island to take on the cargo of caustic soda. Henry C–5, ¶ 20. He tended to the barge on the voyage and supervised the loading of the caustic soda. Henry C–5.1, ¶¶ 34. Upon arrival at the Kuehne Chemical dock, Henry, aided by members of the Tugboat's crew, secured the CYNTHIA M to the dock, *Id.*, ¶ 36; he then opened the Butterfly Valves in preparation for off-loading the barge. *Id.*, ¶ 37. Henry's work contributed to the operation of the CYNTHIA M and he is, therefore, properly considered a "crewmember" of the vessel.

### 2. Henry's Negligence

■ As indicated, despite not being assigned to unload the CYNTHIA M, Henry opened the Butterfly Valves at approximately 3:30 a.m. in anticipation of the discharge operations that were scheduled to begin at 6:00 a.m. Henry C–5, ¶¶ 36–39. Henry then left the barge unattended. *Id.*, ¶ 34. These actions were contrary to Kuehne Chemical company procedures and Woods testified he advised Henry not to open the Butterfly Valves in this manner. Woods C–12, ¶ 16. Henry's actions caused the Casualty. Document 2 at unnumbered p. 9. In light of these established facts, it appears the opening of the Butterfly Valves was negligent.

### 3. Due Diligence

■ No evidence was presented showing that want of due diligence on the part of Kearny Barge contributed to the casualty. As indicated, Henry was adequately trained. The CYNTHIA M was in a seaworthy condition at the time of the Casualty; her only reported problems were the two cargo valves Henry was unable to close after loading the barge. Henry C–5, ¶¶ 21–23. This posed no danger to the CYNTHIA M, however, because the cargo could not flow between the

interior tanks with only these two valves open. *Id.*, ¶ 25.

Because the Casualty was caused by Henry's negligence and no want of due diligence on the part of Kearny Barge has been demonstrated, the costs arising from the salvage of the CYNTHIA M fall within the coverage provided by Global's Hull and Machinery Policy.

### B. *The Global P & I Policy*

■ As indicated Global P & I Policy insured against "[l]iability for loss of, or damage to, or in connection with cargo ... carried, or which has been carried on board the vessel named herein." Document 33, Clause 8; *see* Document 110. Kuehne Chemical incurred damages of $241,147.69, but has properly mitigated its damages so .that its net losses as a result of the Casualty were $163,-328.00. *Id.*, ¶¶ 65–67. Kuehne Chemical's claim against Kearny Barge for the value of these losses was passed on to Global, as Kearny Barge's P & I insurer. Complaint, ¶ 33.

Kearny Barge's liability to Kuehne Chemical for Kuehne Chemical's cargo losses fall squarely within the coverage provided by the Global P & I Policy. Global has provided no justification for its apparent refusal to respond to Kearny Barges's claim.

### C. *The WQIS Policy*

■ The WQIS Policy provides that WQIS will reimburse Kearny Barge for the costs and expenses Kearny Barge incurs as a result of liability imposed under CERCLA and for the costs and expenses it incurs for "removal, response or remedial action ... for which liability would have been imposed on Kearny Barge under Section 107(a)(1) [6] of

CERCLA had Kearny Barge not undertaken such removal, response or remedial action voluntarily." Document 244 (WQIS Policy, Part I, Section C). The WQIS Policy excludes from coverage any "cost or expense incurred by [Kearny Barge] without the prior consent of WQIS." Document 244 (WQIS Policy, Part III). This exclusion, however, does not apply to costs or expenses related to "removal, response or remedial action ... for which liability would have been imposed under ... CERCLA had the assured not undertaken such removal, response or remedial action voluntarily." Id.

■ The parties essentially agree the issue to be decided is whether the activities undertaken by Donjon were entirely salvage or whether some of its activities may properly be attributed to pollution control and, therefore, are covered by the WQIS Policy. WQIS Summation at 4; Kearny Barge Reply at 1. This is a question of fact. *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188, 1195 n. 3 (9th Cir.1986). "There are no rules of law to apply to [the] facts to determine whether the activities were salvage or pollution control. The determination is a purely factual one founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.'" *Id.* (quoting *United States v. McConney,* 728 F.2d 1195 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (quoting *C.I.R. v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960))).

The facts established at trial indicate the refloating of the CYNTHIA M was a salvage operation and the potential for pollution posed by the caustic soda remaining on board

---

6. Section 107(a)(1) of CERCLA, codified at 42 U.S.C. § 9607(a)(1), provides that "the owner and operator of a vessel or facility ... shall be liable for—
    (A) all costs of removal or remedial action incurred by the United States Government ...
    (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
    (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

    (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.
42 U.S.C. § 9607(a)(1). WQIS does not dispute that costs incurred by Kearny Barge for the "removal, response and remedial action taken in regard to spills ... of hazardous materials are covered by the WQIS Policy. Hobbie C–13, ¶ 5. WQIS merely argues that the refloating of the CYNTHIA M was a salvage operation not a pollution response. WQIS Summation, ¶¶ 7–8.

did not affect the costs associated with Donjon's salvage efforts.

The Coast Guard diving team's underwater survey of the exposed bottom plating of the CYNTHIA M shortly after the Casualty indicated her hull was intact. Document 5 at 2. On 16 March 1994, the day after the Casualty, Randive's divers succeeded in closing all tank openings and cargo valves, thereby stopping the leaking of caustic soda from the CYNTHIA M. Document 5 at 2–3. From that time until the completion of the salvage of the CYNTHIA M there was no further release of caustic soda from the barge except for a minor escape during the refloating operation, too small to require a cleanup. Stoll C–14, ¶¶ 5, 27, 29. In fact, on 19 March, thirteen days before the successful refloat of the CYNTHIA M, the Coast Guard released S & D Environmental, the pollution cleanup contractor, requesting only that they return on the day of refloating. Id., ¶ 9.

Although Kearny Barge argues the time pressure imposed on the salvage efforts because of the pollution threat greatly increased the costs of the operation, the Coast Guard waited until 25 March 1994, ten days after the Casualty, before they "federalized" the salvage. Document 15. Kearny Barge's expert witness, van Hemmen testified that, absent a pollution hazard or other similar danger, the salvors would have been able to approach the salvage in a "relaxed fashion." Tr. at 284. van Hemmen stated that, without Coast Guard interference, a week to ten days to plan a salvage operation would be a reasonable amount of time to plan a salvage operation in a "relaxed" manner. Id. As stated, the Coast Guard waited until ten days after the Casualty before it federalized the salvage efforts; accordingly, Kearny Barge has not demonstrated Coast Guard pressure forced it into a more costly salvage contract. In fact, the Coast Guard waited five days after "federalization" of the salvage efforts without commencing a salvage operation and, after Kearny Barge was able to conclude its negotiations with Donjon, returned the salvage operation to Kearny Barge's control. Document 26, Cunha C–3, ¶ 52.

As indicated, Kearny Barge's witnesses lacked credibility. Swift did not possess the experience to render a reliable opinion regarding the costs of the hypothetical salvage operation. The Swift Survey, moreover, was flawed. He bases his $70,000.00 estimate on inaccurate per diem charges on the salvage equipment; the survey understates the cost of the equipment and labor used in salvage operations. Tr. at 157–159. He prepared the Swift Survey based on the less expensive time and materials method of salvage rather than a "lump sum, no cure, no pay" salvage basis which is more common in the marine industry and is preferred by owners and hull underwriters in most circumstances. Swift C–9, ¶¶ 38–47. Finally, he assumed a unlikely set of circumstances including that no complications would arise during the hypothetical salvage operation.

Although van Hemmen is better qualified than Swift to render an estimate of expected salvage costs, his opinion is also flawed. Like Swift, van Hemmen assumed unrealistic conditions for the hypothetical salvage: (1) no Coast Guard interference; (2) the salvage operations could be carried out in a relaxed fashion; (3) the salvage operations could accommodate the salvor's schedule; and (4) a continuous 24–hour operation would not be required. van Hemmen C–8, ¶ 17. van Hemmen speculated that the salvors could pump off the barges' ballast or off-load the cargo. Tr. at 283. As indicated, this plan would likely have created stability problems which may have caused the CYNTHIA M to fully capsize, posing danger to the salvors and presenting a hazard to navigation. Sambrook C–15A. van Hemmen admitted at trial that this was a possible result of his plan. Tr. at 287.

Both Swift and van Hemmen, moreover, based their estimates on a hypothetical salvage operation that would not work. They assumed a cargo that could be pumped off the CYNTHIA M; as indicated, however, the caustic soda remaining on board was to some degree and extent frozen.

The facts of the instant case are similar to those in Port of Portland, where the Ninth Circuit affirmed the District Court's finding that the cost of floating 65,000 gallons of fuel oil from a sunken and leaking dredge should not be charged to the pollution underwriter.

796 F.2d at 1195. In *Port of Portland,* the court held that if the cost would normally be a salvage expense it should be charged to the hull & machinery underwriter, even though the activity also abated a pollution threat:

> One day after OREGON sank the Port elected to pump the 65,000 gallons of fuel oil into standby tanks on shore. The Port's witnesses testified the action was taken because (1) oil was constantly bubbling to the surface; (2) the Coast Guard advised the Port to remove the fuel oil; and (3) the oil was a potential threat of pollution. The costs attributed to fuel pumping was $34,154.86. The court found *this cost was incurred as a necessary step in salvaging* . . . . [T]he tank pumping was a necessary prerequisite to salvage and to raising the [vessel]. .

796 F.2d at 1195 (emphasis added). In the instant case, the caustic soda was a potential threat of pollution and the refloating of the CYNTHIA M addressed the threat. As indicated, however, the costs associated with the refloating were in the nature of salvage, not pollution control. The successful salvage rescued the "Hull" of the CYNTHIA M and its costs are properly charged to Global; as in *Port of Portland,* the pollution prevention resulting from the refloating of the CYNTHIA M was incidental to the salvage of the CYNTHIA M and the salvage costs are not chargeable to the WQIS Policy.

### D. *WQIS Liability*

As indicated, the Adjustment allocates a portion of Windward's fee to WQIS. Windward was Kearny Barge's broker; it acted as an agent for Kearny Barge and was never an agent for WQIS. Hobbie C–13, ¶ 23. Kearny Barge has provided no basis for its claim against WQIS for the portion of Windward's fees allocated to WQIS by the Adjustment.

The WQIS Policy, moreover, is an indemnification policy; WQIS is only obligated to indemnify Kearny Barge for costs covered by the WQIS Policy *after* Kearny Barge pays the costs. Document 244. Because, as indicated, Kearny Barge had not paid the bills of the NJDEPE, First Marine Shipyard, Ran-

dive and Weeks at the time of trial, WQIS was not liable for these expenses. While WQIS apparently concedes the WQIS Policy provides coverage for a portion of the NJDEPE and Randive bills, it "disputes any allocations of [the First Marine Shipyard and Weeks] costs to WQIS even if they are eventually paid, as there is . . . no justification for the allocation of these charges to WQIS." WQIS Summation at 22 (citing Hobbie C–13, ¶¶ 12, 13, 15). Insufficient evidence was submitted at trial to determine whether these costs fall within the coverage provided Kearny Barge by the WQIS Policy. This determination need not be made. As stated, Kearny Barge had not paid these expenses; accordingly, WQIS is not liable for them.

### E. *Borrowed Servant*

WQIS seeks judgment against Kuehne Chemical "for all sums which may be adjudged herein against WQIS in favor of [Kearny Barge]." WQIS Third–Party Complaint, *Ad damnum* clause, ¶ (i). WQIS also seeks judgment against Kuehne Chemical for "all sums expended by WQIS as a result of the spill." *Id., Ad damnum* clause, ¶ (ii). WQIS bases its claim on a provision in the WQIS Policy which provides WQIS is subrogated to the rights which Kearny Barge may have against any other person, entity or fund, with respect to any payment made under the WQIS Policy. *Id.,* ¶ 6.[7]

Whether WQIS is entitled to judgment against Kuehne Chemical depends on whether Henry was a "borrowed employee" while he was performing his work for Kearny Barge. If Henry was a "borrowed employee," he is considered a Kearny Barge employee and WQIS is not entitled to judgment against Kuehne Chemical. If Henry was not a "borrowed employee," under the WQIS Policy, WQIS would be subrogated to the rights of Kearny Barge and would be able to seek judgment against Kuhene for the losses arising from Henry's negligence.

The borrowed employee doctrine was first recognized by the Supreme Court in *Standard Oil Co. v. Anderson,* 212 U.S. 215, 29

---

**7.** As indicated, Global made essentially the same claim.

S.Ct. 252, 53 L.Ed. 480 (1909). In *Standard Oil,* the Court stated:

> One may be in the general service of another, and nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation.

212 U.S. at 220, 29 S.Ct. at 253.

The Court further explained:

> It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men become *pro hoc vice* the servants of him to whom they are furnished.... In [that] case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work because the work is his work and they are for the time his workmen.

*Id.* at 221, 29 S.Ct. at 254.

In *Standard Oil,* the plaintiff was injured because of the negligence of a winchman. 212 U.S. at 218, 29 S.Ct. at 252. The winchman was in the general employ of the defendant who had hired the plaintiff's employer, a stevedore, to load a vessel. *Id.* At the time the plaintiff was injured, the winchman was helping the stevedore load the vessel. *Id.* The plaintiff sued the defendant on *respondeat superior* grounds based on the winchman's negligence. *Id.* The Court addressed the question of "whether the winchman was, at the time the injuries were received, the servant of the defendant or of the stevedore. If he was the servant of the defendant ... the defendant was responsible for his negligence. If not, that is the end of the case, and it is not necessary to inquire what would be the measure of the liability of the stevedore." *Id.* at 218–19, 29 S.Ct. at 253. To answer the question, the Court concluded, "we must inquire whose work is being performed, a question which is usually answered by ascertaining who has the power to control and direct the [employee] in the performance of his work." *Standard Oil,* 212 U.S. at 221–22, 29 S.Ct. at 254.

■ Subsequent to the Supreme Court's announcement of the borrowed servant employee in *Standard Oil,* various courts, notably the Fifth Circuit, have developed a set of questions or factors to consider in determining whether someone is a borrowed employee:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Brown v. Union Oil Co. of California,* 984 F.2d 674, 676 (5th Cir.1993) (citing *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 312–13 (5th Cir. 1969)); *Capps v. N.L. Baroid–NL Indus., Inc.,* 784 F.2d 615 (5th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986); *Gaudet v. Exxon Corp.,* 562 F.2d 351, 355 (5th Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). Of these factors, the most important is the first, who controlled the work of the employees. *See Standard Oil,* 212 U.S. at 221–22, 29 S.Ct. at 254. Both WQIS and Kuehne Chemical endorse this analysis. *See* WQIS Summation at 30; Kuehne Chemical Summation at 17.

### 1. *Who Controlled Henry's Work?*

At issue is the work performed by Henry in operating the CYNTHIA M. Kuehne Chemical directed Henry to work with Kear-

ny Barge. Henry C–5.1, ¶ 16. Kuehne Chemical, however, did not exercise control over Henry's work for Kearny Barge. *Id.,* ¶ 29. In fact, "[n]o one employed by [Kuehne Chemical] had the qualifications necessary to direct Henry with regard to the specific operations of the CYNTHIA M, that is, with regard to its loading and unloading." *Id.,* ¶ 30. After being assigned to work for Kearny Barge, Henry received his training from Woods. Henry C–5, ¶¶ 11–16; Woods C–12, ¶ 15. Henry received no instructions regarding the operation or the loading and unloading of the CYNTHIA M from any Kuehne Chemical employee. Henry C–5.1 ¶¶ 23, 29. Woods, a Kearny Barge employee, was the only one who supervised Henry with regard to the specific operations of the CYNTHIA M including the loading and unloading of the barge. *Id.,* ¶ 28. Kearny Barge, not Kuehne Chemical, exercised control over Henry with regard to his work on the Cynthia M. *See Capps,* 784 F.2d at 617.

In *Capps,* Capps's employer assigned him to work at defendant Baroid's facility and a Baroid employee supervised and directed Capps in the performance of his work. 784 F.2d at 616. Capps' general employer gave him no instructions concerning the specific work he was to perform at Baroid. *Id.* at 617. The Fifth Circuit affirmed the district court's decision that Capps was a borrowed employee, agreeing with the district court's conclusion that Baroid "controlled" Capps, for the purposes of the borrowed employee analysis. *Id.; contra Standard Oil,* 212 U.S. at 225, 29 S.Ct. at 256 (Winchman remained under the control of the defendant, his employer, who furnished work to a stevedore where the "work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its control.").

As indicated, Woods controlled Henry in the performance of his work aboard the Cynthia M. Kearny Barge, therefore, through Woods, exercised control over Henry and the work he performed for Kearny Barge.

#### 2. *Whose Work Did Henry Perform?*

Henry tended to the CYNTHIA M and his work included loading and unloading the barge. Henry C–5.1, ¶ 26; Woods C–12.1, ¶ 13. Henry performed essentially the same work as Woods who was a Kearny Barge employee. Woods C–12.1, ¶ 32. As indicated, Kearny Barge uses its barges, including the CYNTHIA M, to deliver raw chemicals, such as caustic soda, to Kuehne Chemical's facility. Goetzel C–1A, ¶ 7. On the day of the Casualty, Henry tended to the CYNTHIA M on its return voyage from the anchorage at Staten Island to the Kuehne Chemical dock, Henry C–5, ¶ 30; once at the Kuehne Chemical Dock, he prepared the vessel for unloading. *Id.,* ¶ 36. The work Henry performed, relevant to this action, was the work of Kearny Barge.

#### 3. *Was there an agreement or understanding between Kearny Barge and Kuehne Chemical?*

"Although a formal agreement between the two employers is not considered indispensable to the borrowed-servant relationship, the very terms 'borrowed' and 'loaned' connote some type of agreement, understanding, or meeting of the minds between the borrower and the lender." *Ruiz,* 413 F.2d at 313. Kearny Barge and Kuehne Chemical determined Kearny Barge needed someone to replace Woods on occasions when he was ill or otherwise unavailable. Goetzel C–2A, ¶ 25; Woods C–12.1 ¶ 20. Kuehne Chemical provided Henry for these purposes. Goetzel C–2A, ¶ 26; Woods C–12.1, ¶ 22. Henry, although an employee of Kuehne Chemical, worked on the Cynthia M for approximately five months prior to the Casualty. Henry C–5.1, ¶ 18. During this period, although Kuehne Chemical continued to pay Henry's salary, Kearny Barge reimbursed Kuehne Chemical for Henry's services. Goetzel C–1A, ¶ 17. Accordingly, some type of agreement, understanding or meeting of the minds existed between Kearny Barge and Kuehne Chemical regarding Henry's services.

#### 4. *Did Henry Acquiesce to the Employment Arrangement?*

As indicated, Henry worked on the Cynthia M for approximately five months prior to the Casualty. In fact, at the time of trial, Henry continued to work on the Cynthia M.

Henry C–5.1, ¶ 18. Henry, moreover, testified he was aware of the arrangement. *Id.,* ¶ 16. This is sufficient to infer that Henry acquiesced to the employment arrangement. *See Brown,* 984 F.2d at 676 (one month of work and awareness on the part of employee of employment arrangement constituted acquiescence); *Capps,* 784 F.2d at 616 (one day was sufficient).

### 5. *Did Kuehne Chemical Terminate its Relationship with Henry?*

▮ This factor does not require a showing that Kuehne Chemical completely severed its employment relationship with Henry. As the Fifth Circuit held in *Capps:*

> We do not believe that this factor requires a lending employer to completely sever his relationship with the employee. Such a requirement would effectively eliminate the borrowed employee doctrine as there could never be two employers. The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs.

*Capps,* 784 F.2d at 617–18.

It is sufficient that the lending employer neither exercises control over the employee while he or she works for the borrowing employer nor places restrictions on the borrowing employer with respect to the employment conditions. *Capps,* 784 F.2d at 617–18. Kuehne Chemical provided Henry to work for Kearny Barge, thereafter, Kuehne Chemical exercised no control over Henry with regard to his work for Kearny Barge.

### 6. *Who Furnished the Tools and Place for Performance of Henry's Work?*

Henry worked on the barges of Kearny Barge, including the CYNTHIA M. Goetzel C–1, ¶ 14. Both the "tools" and the "place" for performance were the barges. Because Kearny Barge owned the barges, Kearny Barge provided the means for Henry to perform the work in question.

### 7. *Was the Employment Over a Considerable Length of Time?*

As indicated, Henry worked on the Cynthia M for approximately five months prior to the Casualty. Henry, C–5.1 ¶ 18. During these five months, he made six or seven training voyages with John Woods aboard the Cynthia M and made approximately seven round-trip voyages on his own. Tr. at 40; Henry C–5.1, ¶ 32; Woods C–12.1, ¶ 37. Despite the fact his employment was part-time, this period of time is sufficient in length to weigh in favor of borrowed servant status. *See Billizon v. Conoco, Inc.,* 993 F.2d 104, 105 (5th Cir.1993) (three months full-time employment weighed in favor of borrowed servant status).

### 8. *Who had the right to discharge Henry?*

This factor requires an inquiry whether Kearny Barge had the authority to discharge Henry from his work with Kearny Barge, not whether Kearny Barge had the right to fire Henry from his employment with Kuehne Chemical. *Capps,* 784 F.2d at 618. Despite Woods' testimony that he lacked the authority to fire Henry, Tr. at 6–7, it appears Kearny Barge's officers, including Goetel and Kuhene, had the authority to discharge Henry from his duties as barge worker for Kearny Barge.

### 9. *Who had the obligation to pay Henry?*

Kuehne Chemical was obliged to pay Henry, but Kearny Barge reimbursed Kuehne Chemical for Henry's services. Goetzel C–2A, ¶ 35. This arrangement favors a finding that Henry was a "borrowed servant." *Capps,* 784 F.2d at 618. In *Capps,* the court found that, while the general employer paid the borrowed employee, the special employer in essence paid the employee's salary because it gave the general employer the funds to cover the salary of the employee. *Id.*

The facts established at trial indicate Henry was a borrowed servant of Kearny Barge. Henry's work on the CYNTHIA M was for the account of Kearny Barge; the benefit Kuehne Chemical derived from his work was incidental.

WQIS, however, argues even if Henry were held to be a borrowed servant of Kearny Barge, Kuhene Chemical would not be relieved of liability, absent evidence Henry

"abandoned his service" to Kuehne Chemical. WQIS Summation at 34. In support of this argument, WQIS quotes comment (b) to section 227 of the Restatement (Second) of Agency which states:

> *Inference that original service continues.* In the absence of evidence to the contrary, there is an inference that the actor remains in his general employee so long as, by the service rendered another, he is performing the business entrusted to him by his general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

WQIS Summation at 34 (quoting Restatement (Second) of Agency § 227, comment (b) (1958)). WQIS also relies for support on *Tyson v. Litwin Corp.*, 826 F.2d 1255 (3d Cir.1987). WQIS Summation at 33–34; WQIS Reply at 20–21.

In *Tyson,* the district court had declined to dismiss a claim against a "lending employer" for injuries caused by its borrowed employees' negligence. 826 F.2d at 1259. The Third Circuit observed that for derivative liability to attach, the lending employer must have borne "some responsibility for the conduct of its 'loaned' employees" when they committed their acts of negligence and that "[t]his question is ultimately a jury issue if sufficient evidence is presented." *Id.* The court concluded:

> Although the evidence is far from overwhelming, given our standard of review, the jury could reasonably conclude that the [borrowed employees] were under [the lending employees] control when they negligently installed the drainpipe resulting in [the plaintiff's] injuries to justify the verdict against the [lending employer] as co-employer.

*Tyson,* 826 F.2d at 1259.

Because, as indicated, the established evidence in the instant case indicates Henry was not controlled by Kuehne Chemical with regard to his job responsibilities for Kearny Barge, WQIS's arguments are without merit and its reliance on *Tyson* and the Restatement (Second) Agency is misplaced. Because Henry is considered an employee of Kearny Barge for the purposes of this litigation, the subrogation claims against Kuehne Chemical have no basis.

### F.  *Attorney Fees*

■ Rule 4:42–9(a)(6) provides "fee[s] for legal services shall be allowed ... in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." *Id.* Kearny Barge argues Global and WQIS are liable for its attorney fees pursuant to Rule 4:42–9. Kearny Barge Summation at 92–99.

■ Rule 4:42–9 is a rule of state court procedure and does not create an independent law claim. *Leonardis v. Burns Intern. Sec. Services, Inc.,* 808 F.Supp. 1165, 1186 (D.N.J.1992) *see First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co.,* 803 F.2d 1308 (3d Cir. 1986). Kearny Barge recognizes Rule 4:42–9 is a rule of procedure. Kearny Barge Summation at 95.

The Federal Rules of Civil Procedure "govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in *admiralty.*" Fed.R.Civ.P. 1 (emphasis added). State procedural rules are only applicable in a Federal action (1) insofar as they are incorporated by reference into certain federal rules, *see e.g.,* Fed.R.Civ.P. 64 (attachment), and (2) to the degree that *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) requires the federal court in diversity to follow state procedural rules where they will substantively effect the outcome of the litigation. Neither circumstance is present in the instant case.

While some courts have applied Rule 4:42–9(a)(6) in Federal court actions, the actions have all been based on diversity jurisdiction. In *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750 (3d Cir.1990), for example, the court held "[s]tate rules concerning the award or denial of attorney's fees are to be applied in cases where federal jurisdiction is based on diversity or if the court is exercising pendent [now supplemental] jurisdiction." *Id.* at 775 n. 47 (citing *Montgomery Ward & Co. v. Pacific Indem. Co.,* 557 F.2d 51, 56 (3d Cir.1977)); *see e.g. Transamerica Ins. Co. v.*

*Keown,* 472 F.Supp. 306, 312 (D.N.J.1979) (applying Rule 4:42–9(a)(6) in a diversity action).

Jurisdiction in the instant action is based upon federal admiralty jurisdiction, not upon diversity. Complaint, ¶ 6. Kearny Barge does not cite, and no decision of a federal court sitting in Admiralty was found, where attorney fees were awarded pursuant to Rule 4:42–9(a)(6). Plaintiff, however, argues Rule 4:42–9(a)(6) is applicable in an admiralty action brought in New Jersey because of the " 'savings to suitors' clause." Kearny Barge Summation at 94.

Originally part of the Federal Judiciary Act of 1789, the "saving to suitors" clause is now codified as 28 U.S.C. § 1333(1) which provides in pertinent part: "The district courts shall have original jurisdiction exclusive of the courts of the States, of: . . . Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. . . ." 28 U.S.C. § 1333(1).

The "savings to suitors" clause does not allow the recovery of attorney fees under a state procedural rule. "Under the savings to suitors clause, an action 'cognizable in admiralty may also be brought, assuming the existence of some independent jurisdictional base like diversity of citizenship, as a civil suit. . . .' " *Complaint of Nautilus Motor Tanker Co., Ltd.,* 900 F.Supp. 697, 701 (D.N.J.1995) (citing *Romero v. Bethlehem Steel Corp.,* 515 F.2d 1249, 1252 (5th Cir. 1975); *Rasmussen v. United States,* 1984 A.M.C. 329, 1983 WL 632 (N.D.Cal.1983)). Kearny Barge has not alleged diversity jurisdiction nor does it discuss whether supplemental jurisdiction exists. Therefore, even if Rule 4:42–9(a)(6) were a substantive law rather than procedural rule, it is unclear whether jurisdiction exists over its claim for attorney fees. *See Complaint of Nautilus,* 900 F.Supp. at 701. The cases cited by Kearny Barge do not address this issue; they merely address the application of state substantive law in Admiralty actions, not state procedural law. *See Pace v. Insurance Co. of N.A.,* 838 F.2d 572 (1st Cir.1988); *Southworth Machinery Co. v. F/V COREY PRIDE,* 994 F.2d 37 (1st Cir.1993). In *Pace,* for example, jurisdiction rested upon 28 U.S.C. § 1332, not upon 28 U.S.C. § 1333. 838 F.2d at 579. The *Pace* court, moreover, was addressing a Rhode Island substantive cause of action allowing recovery of damages and attorney's fees for an insurer's bad faith refusal to pay or settle claims, not a state procedural rule. 838 F.2d at 578–79.

### III. *Conclusions of Law*

1. Jurisdiction exists over this action pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. The salvage costs of refloating the CYNTHIA M are properly charged to the Global Hull and Machinery Policy. Henry was a crewmember of the barge, his negligence caused the Casualty and there was no want of due care on the part of Kearny Barge. Although the Complaint seeks only a judgment against Global for the amount "apportioned to it under the adjustment in the amount of $282,252.86, plus interest," Complaint, *Ad damnum* clause, ¶ (b), because it appears all of Donjon's costs are properly attributed to salvage, it is just, proper and equitable under the circumstances to hold Global liable for Donjon's entire bill. Judgment will, therefore, be entered against Global in the amount of $451,252.86, plus interest.

3. The WQIS Policy does not provide coverage for salvage costs. Because the costs associated with the refloating of the CYNTHIA M were salvage costs, not pollution abatement costs, they are not properly charged to the WQIS Policy. Kearny Barge, moreover, has not demonstrated that any of the costs allocated by the Adjustment to WQIS are covered by the WQIS policy; the claims against WQIS are, therefore, dismissed in their entirety.

4. Kearny Barge's liability to Kuehne Chemical for Kuehne Chemical's cargo losses resulting from the Casualty is properly covered by the Global P & I Policy. Judgment, therefore, is entered against Global in the amount of $163,-328.00, plus interest.

5. Henry was a borrowed servant of Kearny Barge at the times relevant to the instant action. WQIS, therefore, has no subrogation rights against Kuehne Chemical. The WQIS and Global Third–Party Complaints against Kuehne Chemical are, therefore, dismissed in their entirety.

6. Kearny Barge's claim for attorney fees under Rule 4:42–9(a)(6) is without merit and is, therefore, dismissed.